UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
AIR TRANSPORT ASSOCIATION OF    :
AMERICA, INC. d/b/a AIRLINES FOR   :
AMERICA,                      :
                           :
          Plaintiff,    :   Civ. No. _____
                           :
       v.                :
                           :
KENNETH J. MEYER, in his official capacity  :
as Commissioner of the Department of    :
Business Affairs and Consumer Protection,   :
                           :
         Defendant.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## <u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

1. Plaintiff Air Transport Association of America, Inc. d/b/a Airlines for America ("A4A"), by and through its undersigned counsel, brings this Complaint for Declaratory and Injunctive Relief against Kenneth J. Meyer, in his official capacity as Commissioner of the Department of Business Affairs and Consumer Protection ("BACP"), and alleges upon knowledge with respect to itself and its own acts, and upon information and belief as to all other matters, as follows:

2. The Chicago Paid Leave and Paid Sick Leave Ordinance (Municipal Code of Chicago art. II, tit. 6, ch. 6-130) and any rules promulgated by the BACP thereunder (collectively referred to herein as the "Ordinance"), as applied to the Airlines,[1] are preempted by the Airline Deregulation Act of 1978 (49 U.S.C. §§ 41701-41726) (the "ADA") and the Railway Labor Act (45 U.S.C. §§ 151-188) (the "RLA").

---

[1] A4A's member carriers as a group are referred to herein as the "Airlines," and any one member carrier is referred to as an "Airline."

3.     The Ordinance, as applied to the Airlines, is preempted by the ADA because the Ordinance "relate[s] to" and has a "significant impact" on the Airlines' "price[s], route[s], or service[s]."  49 U.S.C. § 41713(b); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384, 390 (1992).  Among other things, paid leave and paid sick leave laws, like the Ordinance, have caused and/or will cause an increase in employee use and abuse of sick leave and late-scheduled or ill-timed paid leave, which in turn has had and/or will have a significant impact on the services provided by the Airlines, including and up to causing and contributing to flight delays and cancellations.

4.     The Ordinance, as applied to the Airlines, is also preempted by the RLA because the Ordinance impermissibly "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz,* 312 U.S. 52, 67 (1941), when it enacted the RLA to stabilize labor-management relations in the nation's vital transportation industries and thereby to prevent interruptions to interstate commerce.  The Ordinance frustrates the congressional objectives including by, among other things, (i) imposing a pervasive scheme of regulation with respect to numerous aspects of the working relationship between Airlines and their employees, in derogation of the terms of collective bargaining agreements carefully negotiated over long periods of time between the Airlines and the unions representing the Airline employees; (ii) mandating through legislation specific terms and conditions of employment for Airline employees, which their unions have been unable to achieve through the collective bargaining process, thereby circumventing the collective bargaining process and depriving the Airlines of the opportunity to obtain any benefit in exchange for providing employees more generous terms of employment than the Airlines already provide; (iii) delegating to unions the unfettered authority to determine whether Airlines must comply with the requirements of the Ordinance; and (iv)

2

expressing in multiple ways an affirmative preference for union representation of employees, rather than remaining neutral as Congress envisioned in its enactment of the federal labor laws.

## NATURE OF THE ACTION

5.      A4A seeks a declaration, pursuant to 42 U.S.C § 1983 and/or 28 U.S.C. §§ 2201-2202, that the Ordinance in its entirety, as applied to the Airlines:

(a)      is preempted by the ADA because the Ordinance relates to and has a significant impact on the Airlines' prices, routes, and services, and is therefore unenforceable by virtue of the Supremacy Clause of the United States Constitution; and

(b)      is preempted by the RLA because the Ordinance creates an obstacle to the full effectuation of the collective bargaining process and thereby thwarts the purposes of Congress in enacting the RLA and is therefore unenforceable by virtue of the Supremacy Clause of the United States Constitution.

6.      A4A also seeks a permanent injunction prohibiting enforcement of the Ordinance against the Airlines.

## THE PARTIES

7.      Plaintiff A4A is a nonprofit corporation organized under the laws of the District of Columbia, with its principal place of business in Washington, D.C.  A4A advocates on behalf of ten federally regulated air carriers, which include seven passenger carriers, Alaska Airlines, Inc. ("Alaska"), American Airlines, Inc. ("American"), Delta Air Lines, Inc. ("Delta"), Hawaiian Airlines, Inc. ("Hawaiian"), JetBlue Airways Corp. ("JetBlue"), Southwest Airlines Co. ("Southwest"), and United Airlines, Inc. ("United"), and three cargo carriers, Atlas Air, Inc. ("Atlas"), FedEx Express ("FedEx"), and UPS Airlines ("UPS").  The Airlines (and their marketing partners) account for more than 90% of the annual passenger and cargo traffic on U.S. airlines and, along with their wholly owned subsidiaries, the Airlines directly employ more than 90% of the airline industry's 746,000 full-time equivalent workers.  Commercial aviation, moreover, drives 5% of U.S. gross domestic product and helps support more than 10 million U.S. jobs.

8. Among other things, A4A advocates for the Airlines on issues of safety, security, customer service, environment, energy, taxes, and economic growth. A4A also works with the Airlines in legal, political, and regulatory arenas to foster a business and regulatory environment which promotes a safe, secure, and financially stable airline industry in the United States.

9. All of the Airlines are federally regulated air carriers, and most operate domestic and/or international flights daily into and out of airports in Chicago (including Chicago O'Hare International Airport and Chicago Midway International Airport). Absent relief from this Court, they will be subject to the Ordinance.

10. Defendant Kenneth J. Meyer is the Commissioner of the BACP and named as a Defendant in his official capacity. In his official role, he is charged with enforcement of the Ordinance. *See* Mun. Code of Chi. art. II, tit. 6, ch. 6-130-070.

## JURISDICTION AND VENUE

11. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, because A4A's claims arise under the ADA, the RLA, and the Supremacy Clause of the United States Constitution. *See* 49 U.S.C. § 41713; 45 U.S.C. §§ 151-188; U.S. Const. art. VI, cl. 2.

12. The Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, authorizes the declaratory and other relief sought herein.

13. A4A has associational standing as an organization to bring claims on behalf of the Airlines for the declaratory and injunctive relief sought herein. An organization has standing to sue on behalf of its members when: (a) its "members would otherwise have standing to sue in their own right"; (b) "the interests the [organization] seek[s] to protect are germane to [its] organizational purposes"; and (c) "neither the claim asserted nor the relief requested requires the participation of individual [organization] members in the lawsuit." *Ezell v. Chicago*, 651 F.3d 684, 696 (7th Cir. 2011); *see also Students for Fair Admissions, Inc. v. President & Fellows of*

4

*Harvard Coll.*, 143 S. Ct. 2141, 2157 (2023) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

14.     A4A satisfies each of the three requirements for associational standing.  *First*, the Airlines subject to the Ordinance are substantially and adversely affected by the Ordinance including because:  (i) they have chosen not to comply with the Ordinance on the basis of some or all of the legal grounds set forth herein and, as a result of said non-compliance, they will face or have the prospect of facing enforcement actions from the BACP; or (ii) they will comply with the requirements of the Ordinance and said compliance will impose additional costs and disruptions to their operations and/or their collective bargaining negotiations.  These Airlines would each have standing in their own right to challenge the Ordinance.  *See Shakman v. Clerk of Cook County*, 994 F.3d 832, 840 (7th Cir. 2021); *see also Warth v. Seldin*, 422 U.S. 490, 511 (1975).  *Second*, A4A has an organizational interest in eliminating the promulgation and enforcement of disparate paid leave, paid sick leave, and other labor and employment laws by state and local governments -- especially where those laws disrupt the Airlines' operations, adversely impact the Airlines' prices, routes and services in other ways, or undermine the Airlines' ability to negotiate for and/or apply uniform nation-wide policies and CBAs.  *Third*, the relief A4A seeks -- a judgment declaring the Ordinance preempted and unenforceable as applied to the Airlines, and an injunction barring its enforcement -- does not require an individualized determination necessitating the participation in this lawsuit of all of the Airlines.  *See Retired Chi. Police Ass'n v. Chicago*, 7 F.3d 584, 601 (7th Cir. 1993); *Students & Parents for Priv. v. Sch. Dirs. of Twp. High Sch. Dist. 211*, 377 F. Supp. 3d 891, 898 (N.D. Ill. 2019).

15.     Venue is proper in this Court under 28 U.S.C. § 1391(b), as this Court is located in the judicial district where a substantial part of the events or omissions giving rise to A4A's claims

have occurred, are now occurring, and will occur in the future; and because Defendant resides in or is found in this judicial district.

### THE AIRLINES' FLIGHT CREW AND THE SERVICES THEY PROVIDE

16.     Each of the Airlines employs thousands of pilots and flight attendants, who work on flights throughout the United States and the world.  Flight crew[2] are highly mobile workers, who do not work regularly scheduled shifts.  The Airlines' flight crew are assigned to a particular airport or "base."  A base, also known as a "domicile," is the airport where flight crew begin and end their work assignments (also called "trips," "sequences," or "pairings").  The Airlines also allow flight crew to transfer between bases from month to month.  A4A members Southwest, United, and American have a flight attendant and a pilot base in Chicago.

17.     A flight crew member's "base" is not necessarily located in the same city or even state where they live, and it is common for flight crew based in one state to live in another state or even outside of the United States.  Flight attendants who are based in cities where they do not live are known as "commuters."  Commuters who do not live within driving distance of their base are allowed to fly for free on their own Airline, and sometimes on other Airlines as well, between their place of residence and their base.

18.     Because the flights operated by the Airlines in the City of Chicago either begin or end in Chicago, but not both, flight crew based in Chicago do not spend all of their time working in Chicago.  These employees spend much of their work time in federally regulated airspace, and they often pass through multiple airports in the course of a single day, spending just enough time on the ground in each location to prepare for their next flight.

---

[2]     As used herein, the term "flight crew" refers to pilots and flight attendants.

19. Federal regulations require the Airlines to have a minimum number of pilots and flight attendants on board the aircraft before any passengers may board or the aircraft may take off. *See* 14 C.F.R. §§ 121.385, 121.391. Most of the Airlines' flights operate with the minimum staffing level for pilots and flight attendants.

20. Flight crew provide critical services to the Airlines' passengers to ensure a safe, reliable, and on-time operation for the Airlines' passengers. For example, after boarding, pilots are responsible for the safe and on-time transport of all passengers and crew on board their flights. Among other things, flight attendants are responsible for assisting passengers with boarding, ensuring the safety and service of the Airlines' passengers on-board, and preparing aircraft cabins for take-off and landing.

21. Thus, both on-time boarding and on-time departures depend on the on-time arrival of pilots and flight attendants at the gate.

### GROUND CREW AND THE SERVICES THEY PROVIDE

22. Each of the Airlines also employs thousands of ground crew members[3] across the country, often with several hundred or more working at the airports where each Airline has its largest operations. Many of the Airlines have significant complements of ground crew employees in Chicago. Ground crew employees often live near the airport where they work, and are typically considered in three groups: above-the-wing, below-the-wing, and maintenance.

23. <u>Above-The-Wing</u>. As a general matter, above-the-wing ground employees work in a customer service role and are typically those employees whom a passenger will encounter when they arrive at the airport or at the gate. These employees routinely provide services to

---

[3] As used herein, the term "ground crew" includes the Airlines' above-the-wing, below-the-wing, and maintenance employees (who are described *infra* to include, among others, ticket counter agents, customer contact agents, gate agents, ramp and fleet service workers, baggage handlers, and maintenance/mechanic employees).

passengers at the ticket counters and kiosks, at the gates, in premium service clubs, or in baggage service offices.

24.     In particular, the services provided by above-the-wing employees typically include:

(a)     Services at the ticket counters, which include:  (i) checking in passengers; (ii) checking and processing passengers' bags; (iii) assisting with passenger check-in at the kiosks; and (iv) otherwise assisting passengers with travel bookings and reservations.

(b)     Services at the gates, which include:  (i) making seat-assignment and reservation changes requested by passengers; (ii) assisting passengers with any disability accommodations or issues relating to children or pets; (iii) scanning boarding passes; (iv) meeting planes when they arrive; and (v) otherwise assisting with passenger boarding.  At some Airlines, including Southwest, above-the-wing employees working at the gates also help with the weight and balance of aircraft, necessary tasks which must be completed before an aircraft can depart.

(c)     Services at premium service clubs, which include:  (i) assisting the global, business and frequent flyer passengers with their travel needs, including booking club and conference rooms; (ii) assisting with frequent flyer program enrollment; and (iii) providing food and beverages to club and lounge customers.

(d)     Services at baggage service offices, which include assisting arriving passengers when their bags have been mishandled or are missing, or have arrived early.

(e)     Services by customer contact agents who assist passengers that require assistance before or during their travels, including with rescheduling flights when passengers' flights are delayed or cancelled.

25.     Below-The-Wing.  As a general matter, below-the-wing employees largely work on the ramp and in baggage rooms, and perform a variety of services (some of which require specialized training and qualifications), including:

(a)     Baggage loading services, which include:  (i) working in the bag room sorting, scanning, and loading bags onto the proper baggage carts to ensure they are loaded on the correct aircraft; (ii) transporting bags from the bag room to the aircraft; and (iii) loading bags and cargo onto the plane.

(b)     Baggage unloading services, which include unloading bags and cargo from planes arriving in Chicago, and delivering the bags to other planes if the

8

passengers have connecting flights or to the carousel for passenger pick up if Chicago is the final destination.

(c)     Towing services, which include:  (i) towing aircraft from gate to gate to ensure they are in the proper position for their next flight; and (ii) repositioning aircraft from the gates to maintenance hangars or hard stands (often at night).

(d)     De-icing services, which include de-icing the aircraft in the winter.  This service can require specialized training.

(e)     Water and lavatory services, which include:  (i) ensuring that each aircraft's utilities are ready for the next flight; (ii) servicing the potable water tank on the aircraft; and (iii) removing waste from the aircraft lavatories prior to take off.  These services can require specialized training.

(f)     Taxiing services, which include:  (i) assisting aircraft to taxi into and out of the gates on arrival and departure, respectively; and (ii) assisting aircraft to safely park at the gates.

(g)     Deplaning services, which include:  (i) directing the aircraft to the gate after landing; and (ii) positioning the jet bridge to assist passengers in deplaning the aircraft.

26.     <u>Maintenance</u>.  The Airlines also employ maintenance, mechanic, or "tech ops" employees (collectively referred to as "maintenance" employees).  As a general matter, maintenance employees largely work either at the terminal or in aircraft hangars, and perform a variety of services (nearly all of which require at least some special qualifications and/or training), including coordinating and/or performing maintenance or repairs on aircraft, aircraft equipment, and various ground service equipment.  A significant portion of the maintenance employees' work occurs overnight:  for example, maintenance employees perform scheduled or otherwise required services on aircraft (*e.g.*, engine changes and brake and fuel line repairs) to ensure that the aircraft can be in service for its upcoming travel day.  Maintenance employees also respond to issues that arise during pre-flight checks performed by the flight and ground crew, many of which must be resolved prior to an aircraft's departure.

27. The numerous services provided by ground crew are also critical to the on-time boarding and on-time departures/arrivals of flights.

## THE COLLECTIVE BARGAINING AGREEMENTS AND COMPANY POLICIES THAT APPLY TO AIRLINE EMPLOYEES ARE GENEROUS AND COMPREHENSIVE

28. The employment terms of the Airlines' flight crew and ground crew are set forth in detailed CBAs and/or company policies.

29. Some of the Airlines operating in Chicago have CBAs in place for both their flight crew and ground crew. For example, Alaska, American, Southwest, and United each have CBAs with their flight crew and ground crew. These CBAs are extensively negotiated by the union representing a specific group of employees (*e.g.*, flight attendants), on one side, and the employer-Airline, on the other side. Paid sick leave and other paid time off has long been the subject of extensive collective bargaining between Airlines and the unions representing their employees. Those negotiations and the related carrier policies/practices have reflected a delicate balance between the needs of Airline employees to have paid time away from work and the needs of Airlines to have adequate staffing to provide transportation services 24 hours a day, seven days a week, 365 days a year. Once a union and Airline tentatively reach agreement on the CBA -- including, but not limited to, with respect to provisions relating to paid sick leave and other paid time off -- the union generally submits the proposed CBA to the employees for a membership ratification vote. Many of the CBAs are currently amendable and the unions and employer-Airlines are in active CBA negotiations.

30. Two of the Airlines operating in Chicago -- Delta and JetBlue -- have Chicago ground crew employees who are not represented by unions. The employment terms for these employees are therefore set by Delta and JetBlue company policies.

31.     The purpose of the CBAs and company policies is to create a uniform set of work rules that will apply to all employees in a given work group (*e.g.*, flight attendants) on a nationwide basis, regardless of where the employees live or work. In this way, the CBAs and company policies are designed to ensure uniformity, predictability, and fairness across the Airlines' networks in a number of important areas, including: (i) scheduling; (ii) trip and shift trading; (iii) vacation; (iv) other time off; and (v) sick time.

32.     *Scheduling*: The work schedules of the Airlines' employees are generally set by seniority-based bidding processes. In the case of flight attendants and pilots, they typically bid for their schedules based on dozens of criteria, including the number of days or hours they would like to work in a month, the days they would like to have off, the length of their trips, the cities where they would like to lay over, and the other pilots and flight attendants with whom they would like to fly. Ground crew typically bid for their schedules based on their preferred work days, days off, shift times, work areas (*e.g.*, ramp, bag room, ticket counter, and gates), and, where applicable, special qualifications.

33.     *Trip and Shift Trading*: Once their work schedules are initially set by the bidding processes, employees can (and frequently do) trade their trips and shifts with other employees. For example, JetBlue ground crewmembers are able to trade shifts as far as 60 days in advance of a scheduled shift and as close to two hours before a scheduled shift.

34.     *Vacation and Paid Time Off (PTO)*: Vacation amounts vary by seniority, but employees across the Airlines (both flight crew and ground crew) typically accrue between one week of vacation (usually for employees with less than one year of service) to upwards of six weeks of vacation per year.

35.     To ensure that the Airlines maintain adequate staffing levels to continue to safely operate their networks year-round, the Airlines' CBAs and company policies often provide detailed procedures by which employees may bid for vacation time.  The Airlines first determine how many employees in any classification may take vacation during any given period.  For example, during busy travel periods (*e.g.*, around the year-end holidays, during school vacation weeks, or during busy summer travel times), the Airlines may make less vacation time available for bidding so as to ensure that they have sufficient staffing to keep up with the heavier flight loads.  During those time periods when customer flying is not as busy, the Airlines may make more vacation time available for bidding.  The Airlines ensure that the total annual vacation time available for bidding to the employees at any given location is at least the total amount of vacation that the location's employees are eligible to take under the applicable CBAs or company policies.  Once the Airlines determine their required staffing levels and the resulting vacation time to be made available throughout the year, the Airlines' CBAs or company policies then typically require employees to bid for the available vacation dates significantly in advance -- often months -- of the scheduled vacation.  Bidding typically takes place by seniority, and unused vacation time is typically paid to the employee at the end of the year.  Once vacation schedules are set, they will usually not change unless by mutual agreement of the Airline and employee.

36.     For example, Delta ground employees bid for week-long vacation once a year in February by seniority as set forth in Delta's relevant company policy (*e.g.*, in February 2025, Delta ground employees will bid for vacation to be taken from April 1, 202<u>5</u> to March 31, 202<u>6</u>).  If an employee does not bid for all of his or her vacation time during this bidding period, then he or she can retain those vacation days as "incremental vacation days" and request to use them one day (or

more) at a time throughout the year. Delta may approve such requests either on a first come, first serve or seniority basis, and only if it is compatible with Delta's operational needs.

37.     ***Other Leaves of Absences***:  In addition to vacation time, the Airlines' employees have numerous other ways to take time off from work, including personal, family or medical leaves of absences, and unpaid days off.

38.     ***Sick Time***:  The Airlines allow flight crew to accrue generous paid sick leave benefits.  For example, flight attendants at United accrue four hours of sick leave per month, or 48 hours per year, and can accumulate up to 1,250 hours of sick leave at a time.  They also accrue four hours of occupational injury leave per month, or 48 hours per year, and can accumulate up to 400 hours of occupational injury leave at a time.  Similarly, flight attendants at Southwest accrue one trip for pay ("TFP")[4] of sick leave for each ten TFPs flown or credited per month, and can accumulate up to 2,400 TFPs of sick leave at a time.  This accrual rate amounts to roughly one hour of sick leave for every 12 hours worked, which is far more generous than required by the Ordinance (one hour of sick leave for every 35 hours worked).  Flight attendants at American can accrue 4.5 hours of sick leave per month depending on their flying schedule, and can accumulate 1,500 hours of sick leave at a time.  Paid sick time is generally provided for the employee's own illness.  Certain of the Airlines -- including United, for example -- allow some portion of the paid sick hours to be used to care for the employee's family members' unanticipated illness.

39.     As they do for flight crew, the Airlines also provide generous sick leave benefits to ground crew employees.  For example, Southwest's and United's ground employees accrue eight hours of paid sick leave per month, or 96 hours per year.  At Southwest, employees can accumulate

---

[4]     Southwest compensates flight attendants based on "trips for pay" or "TFP," which, pursuant to the applicable CBA, is "based on point-to-point mileage," not on hours.

up to 2,400 hours of paid sick leave at a time; at American, employees can accumulate up to 1,600 hours of paid sick leave at a time; and at United, employees can accumulate up to 1,200 hours of paid sick leave at a time. As with sick leave for flight crew, ground crew are generally allowed to use accrued sick leave for the employee's own illness.

40. Rather than providing "sick time" to their employees, Delta and JetBlue provide their ground employees with "Paid Personal Time" ("PPT") and "Paid Time Off" ("PTO"), respectively. PPT and PTO can be used for any kind of absence, including illness, personal, and family needs. For example, at JetBlue, ground crewmembers can accrue and bank PTO at varying rates based on their number of years of service: ground crewmembers can accrue between 136 and 256 hours of PTO per year and bank between 136 to 512 hours of PTO. JetBlue ground crewmembers can also "sell" back up to 25% of their accrued, unused PTO.

41. The Airlines also maintain attendance and reliability policies for flight crew and ground crew. Some of these policies are promulgated by the Airline, some of these policies are authorized by a CBA but the specific terms are determined by the Airline, and some of these policies are negotiated in detail by the union and Airline in the CBA, but in all cases the purpose of these policies is to allow the Airlines to monitor whether flight and ground crews are coming to work when scheduled, to make sure the Airlines are able to properly staff their flights, and to deliver on-time operations and a satisfactory customer experience. These policies also enable the Airlines to comply with comprehensive federal safety laws and regulations on flight crew work hours and staffing, including those related to duty period limitations and rest requirements.

42. The attendance policies chiefly aim to achieve these objectives with two primary accountability tools: (i) points systems that can lead to potential corrective action, and (ii) allowing the Airlines to request doctors' notes to substantiate employees' use of paid sick leave.

43. <u>Points Systems</u>: Most of the Airlines' attendance policies assess points for each occurrence of sick leave or other unplanned absence. The number of points per occurrence can vary based on the amount of notice employees provide for their absence. For example, for flight attendants at Southwest, a timely sick call of any duration accrues half a point; however, a sick call less than two hours prior to a scheduled departure accrues 2.5 points because a short-notice sick call jeopardizes the Airline's ability to maintain an on-time operation by making it much more difficult to find a replacement flight attendant.

44. Similarly, the points system for ground employees at Southwest ranges from 0.5 points for arriving late to work to two points for not showing up to work when scheduled. For ground employees at United, the points system ranges from 0.5 points for arriving late to work to three points for when an employee does not show up to work when scheduled without calling out sick. For JetBlue crewmembers, the points system ranges from 0.5 points for being 6-60 minutes late to a shift to 2.5 points for not showing up to work when scheduled without calling out.

45. At many of the Airlines, employees receive an additional point or points when they call out sick during busy "critical coverage" periods (such as holidays and school vacations). For example, flight attendants at American accrue an additional point if they call out sick during three "critical coverage" periods: July 1 through 7, the Wednesday through Sunday around Thanksgiving, and December 22 through January 3.

46. Ultimately, the points assessed under the Airlines' attendance policies can factor into the Airlines' progressive discipline policies, which typically start with a series of oral and written warnings (but only after less formal counseling has not worked) and can progress up to termination in very rare circumstances.

15

47.     Doctors' Notes:  In addition to the points systems contained in each of the Airlines' attendance policies, most of the Airlines can also request a doctor's note if the particular circumstances of an employee's sick call suggest potential abuse.

48.     Given the impracticality of investigating sick leave abuse on a case-by-case basis, some of the Airlines can (and do) require doctors' notes from any employee who calls out sick during certain "critical coverage" periods or during "sick leave emergencies."  As one example, United, in accordance with the bargained-for terms of its flight attendant CBA, can require an "absence certificate" (*i.e.*, a medical verification signed by a physician attesting to an absent flight attendant's sickness) from all flight attendants who call out sick during the Fourth of July and Christmas holiday periods.  Similarly, ground employees at United can be required to provide documentation, such as a doctor's note, when they are absent during critical periods such as during the winter holidays, Thanksgiving, and over Memorial Day and Labor Day weekends.  At Southwest, whenever a "sick leave emergency" or "state of emergency" is declared for a particular employee group -- *i.e.*, when Southwest is experiencing higher than normal sick calls for an employee group that threatens the reliability of its operations -- employees who call out sick are required, with few limited exceptions, to go to a company doctor to have their illness verified.

## THE CHICAGO ORDINANCE

49.     On or about November 9, 2023, the City Council of the City of Chicago (the "City Council") passed the Ordinance.

50.     On or about December 13, 2023, the City Council passed an amendment to the Ordinance.

51.     The Ordinance is effective July 1, 2024.  *See* Mun. Code of Chi. art. II, tit. 6, ch. 6-130-030(b)(1).

16

52. The Ordinance imposes a comprehensive and pervasive paid leave and paid sick leave benefit scheme on Chicago employers, including the Airlines.

53. The Ordinance defines an employer as "a person who gainfully employs at least one Employee." *Id.* ch. 6-130-010.

54. The Ordinance defines "Employee" as "an individual who performs work for an employer in the capacity of an employee, as distinguished from a contractor, determined pursuant to Internal Revenue Service guidelines." *Id.* The Ordinance excludes from the definition of Employee "an employee as defined in the federal Railroad Unemployment Act." *Id.*

55. The Ordinance generally defines "Covered Employee" as "an Employee who works at least 80 hours for an Employer within any 120-day period while physically present within the geographic boundaries of [Chicago]." *Id.* Once an Employee works at least 80 hours for an Employer within any 120-day period, then "the Employee will remain a Covered Employee for the remainder of the time that the Employee works for the Employer." *Id.*

56. The Ordinance requires covered Chicago employers, such as the Airlines, to provide two types of leave to their employees: "Paid Leave" and "Paid Sick Leave." *Id.* ch. 6-130-020(a)(1).

57. <u>Paid Leave</u>. Chicago employers must allow employees to accrue one hour of Paid Leave for every 35 hours worked, up to 40 hours, "unless the Employer sets a higher limit." *Id.* ch. 6-130-030(b)(1)-(2). Employees can carry over up to 16 hours of unused Paid Leave accrued during one year to the next. *Id.* ch. 6-130-030(c)(1). If the employer "frontloads" Paid Leave by granting employees 40 hours of Paid Leave on the first day of the employees' annual accrual period, then the employer does not need to allow employees to carry over 16 hours of Paid Leave. *Id.* ch. 6-130-030(f).

58.     Employees may use Paid Leave for "any reason" they choose. *Id.* ch. 6-130-030(h). Employers cannot "require a Covered Employee to provide a reason for such leave" or "require them to provide documentation or certification as proof or in support of the leave." *Id.*

59.     <u>Paid Sick Leave</u>.  In addition to Paid Leave, Chicago employers must allow employees to accrue one hour of Paid Sick Leave for every 35 hours worked, up to 40 hours per year, "unless the Employer sets a higher limit." *Id.* ch. 6-130-030(b)(1)-(2).  Employees can carry over up to 80 hours of Paid Sick Leave from one year to the next. *Id.* ch. 6-130-030(c)(1). Employers may "frontload" Paid Sick Leave by granting employees 40 hours of Paid Sick Leave on the first day of an employee's annual accrual period, but the employee may still carry over up to 80 hours of accrued but unused Paid Sick Leave. *Id.* ch. 6-130-030(f).

60.     Employees may use Paid Sick Leave for a broad range of reasons -- either for the employee or the employee's family members -- including, but not limited to, mental or physical illness, injury or health conditions that prevent working; diagnosis or treatment of medical conditions, preventative care, or treatment of a mental or physical illness, injury, or health condition; and needs stemming from domestic violence, sexual assault, or criminal harassment. Employees may further use Paid Sick Leave if the employee is "ordered" by a public official or health care provider to stay home to "minimize the transmission of a communicable disease," if the employee is "experiencing symptoms or sick with a communicable disease," or because of a "quarantine" or "isolation" order.  Employees may even use sick leave to care for a family member if that person's "school, class, or place of care has been closed." *Id.* ch. 6-130-030(i).

61.     If an employee's need to take Paid Sick Leave is "reasonably foreseeable," then the employer may require the employee to provide seven-days' notice.  But if the need is "not

reasonably foreseeable," then the Ordinance permits employees to provide notice "as soon as is practicable on the day" the employee is using Paid Sick Leave. *Id.* ch. 6-130-030(i)(2).

62.     As with Paid Leave, if an employer denies an employee "approval of their . . . Paid Sick Leave in a manner that prohibits" the employee "from meaningfully having access to such paid time off," then the employer must "increase that [employee's] permissible carry over to include carryover of any such denied . . . Paid Sick Leave." *Id.* ch. 6-130-030(c)(2).

63.     Under the Ordinance, employees begin to accrue Paid Sick Leave and Paid Leave when employment with the employer begins.  Employees may use Paid Sick Leave no later than 30 days after employment begins and Paid Leave no later than 90 days after employment begins. *Id.* ch. 6-130-030(d).

64.     The Ordinance allows employees to decide how much Paid Leave or Paid Sick Leave to use, subject only to an employer's ability to "set a reasonable minimum increment not to exceed four hours of Paid Leave per day or two hours of Paid Sick Leave per day." *Id.* ch. 6-130-030(e).

65.     The Ordinance prohibits employers from requiring an employee to provide documentation that Paid Sick Leave was used for an authorized purpose until an employee is absent for more than three consecutive workdays. *Id.* ch. 6-130-030(i)(3).  If an employer does "require[] documentation before receiving notice that a Covered Employee will be absent for a third consecutive day and using Paid Sick Leave," then the employer faces a "rebuttable presumption that [it] has violated" the Ordinance. *Id.*

66.     The Ordinance prohibits employers from using an "absence-control policy," like the points-based attendance systems utilized by many of the Airlines, "to count paid time off as an

19

absence that triggers discipline, discharge, demotion, suspension, or any other adverse activity." *Id.* ch. 6-130-020(a)(6).

67.     The Ordinance provides that CBAs entered into after July 1, 2024, may "waive" the Ordinance's Paid Leave and Paid Sick Leave rules, "but only if the waiver is set forth explicitly in such agreement in clear and unambiguous terms." *Id.* ch. 6-130-040. In this way, the Ordinance unfairly requires those Airlines with employees covered by CBAs to attempt to negotiate in a give-and-take process for a contractual provision that the Ordinance does not apply to the Airlines' employees, even though the Ordinance is unlawful as applied to the Airlines in the first place. Because of this, some Airlines will have to give up something costly to the union to secure a waiver of the Ordinance (even though the Ordinance is unlawful as applied to the Airlines). Still other Airlines will be unable to secure a waiver, no matter what the Airline can reasonably offer to the union in exchange for it.

## THE ORDINANCE WILL HAVE A
## SIGNIFICANT IMPACT ON THE AIRLINES' PRICES, ROUTES AND/OR SERVICES

68.     The Ordinance will have a significant impact on the Airlines' prices, routes, and/or services. This is because the Ordinance will cause an increase in both use and abuse of sick leave and late-scheduled or ill-timed use of paid leave. Both of these increases will impact the Airlines' prices, routes, and/or services, including and up to causing or contributing to flight delays and cancellations.

### The Ordinance Will Increase Employee Absences

69.     <u>The Ordinance's Paid Sick Leave Hours</u>. The Ordinance provision of Paid Sick hours will encourage employees to use and potentially abuse sick leave, and thus to be absent from work more frequently, for several reasons.

70. ***First***, in many situations, the Ordinance allows employees to take sick time for additional reasons beyond those allowed under the applicable CBA or company policy, including, for example, to care for family members. It follows that if employees are able to use Paid Sick Leave provided by the Ordinance to take time off from work for additional reasons than are specifically permitted by the CBAs or company policies, then employees will indeed use Ordinance-protected leave to take more time off from work than they would without the Ordinance.

71. ***Second***, the Ordinance's prohibition on counting sick leave absences towards employee discipline, *see* Mun. Code of Chi. art. II, tit. 6, ch. 6-130-020(a)(6), interferes with the Airlines' enforcement of their nationwide attendance and reliability policies. Specifically, the Ordinance deprives the Airlines of one of the main accountability tools in their attendance policies -- *i.e.*, their points-based attendance programs -- which assess points for employees' absences and typically assess more points or additional discipline for last-minute absences or absences during "critical coverage" periods. It follows that employees will likely be absent from work more often if points or other discipline cannot be assessed for an employee's absence.

72. ***Third***, the Ordinance's requirement that an employee must be absent for more than three consecutive work days before an employer can request medical verification of illness, Mun. Code of Chi. art. II, tit. 6, ch. 6-130-030(i)(3), practically speaking, substantially restricts the Airlines' ability to investigate the circumstances surrounding employee absences. By restricting the Airlines' ability to request medical documentation for absences, including during certain "critical coverage" periods or during "sick leave emergencies," in particular, the Ordinance will lead to more employee absences.

21

73. <u>The Ordinance's Paid Leave Hours</u>. The Ordinance provision of Paid Leave hours will also encourage employees to use paid leave with significantly less notice to the Airlines and at times when the Airlines require heightened staffing. The Ordinance will therefore cause an increase in late-scheduled or ill-timed use of paid leave. In particular, the Ordinance provides that while employers may require employees to give "reasonable notice" of their intention to use Paid Leave, employers cannot require more than seven-days' notice of an employee's use of Paid Leave. Mun. Code of Chi. art. II, tit. 6, ch. 6-130-030(h). In this way, the Ordinance is squarely at odds with the Airlines' current practice where employees largely bid on their vacation time by seniority and months in advance of the vacation so as to ensure that the Airlines have sufficient staffing arranged at all times, even during some of the busier and more popular vacation time periods when travel may be heavier. It follows that if employees are able to use Paid Leave in the manner provided by the Ordinance, then they will use such Paid Leave (i) during time periods where the employees might not otherwise be eligible to take vacation (*e.g.*, during the busier and more popular vacation time periods when employees may not otherwise have been able to successfully bid for vacation time given their seniority), and (ii) with significantly less notice to the Airlines (*i.e.*, with at most seven-days' notice, rather than the often months-long notice employees currently provide).

**Increased Employee Absences Caused By
The Ordinance Will Significantly Impact The Airlines' Prices, Routes, And/Or Services**

74. <u>The Ordinance's Paid Sick Leave Hours</u>. The increase in employee absences which will be caused by the Ordinance's Paid Sick Leave provisions will impact the Airlines' prices, routes, and/or services. For example, the increase in employee absences will impact the Airlines'

services, including and up to causing or contributing to flight delays and cancellations, for several reasons:

75. ***First***, increased sick calls among flight crew caused by the Ordinance will have a significant impact on the Airlines' services, including by disrupting the Airlines' passenger boarding procedures and causing or contributing to flight delays and cancellations. This is primarily because federal regulations require the Airlines to have a minimum number of pilots and flight attendants on-board before passengers may board the aircraft or the aircraft may take off. *See* 14 C.F.R. §§ 121.385, 121.391. Most of the Airlines' flights operate at the minimum staffing level for pilots and flight attendants. Thus, when a pilot or flight attendant calls out sick (including when using Paid Sick Leave), the Airlines must find a replacement flight crew member. If there is difficulty in finding a replacement pilot and/or flight attendant, the flight may be delayed; and if a replacement pilot and/or flight attendant cannot be found, the flight may be cancelled. Each of these service impacts will directly and adversely affect the customers' experiences while traveling with the Airlines.

76. Moreover, because the Airlines' flight schedules are based upon a complex array of connections and transfers, a delayed departure due to an unexpected flight crew member absence in one location can cause delays in other locations ("downline delays"). Specifically, when a plane arrives at its destination late, that delay can cascade in numerous ways, including (i) to the passengers on the delayed aircraft, who may now miss their connecting flights; (ii) to the delayed aircraft, which may cause its next scheduled flight to be delayed; (iii) to the delayed pilots, who may cause a delay in the next flight they were scheduled to operate (which may not even be on the same aircraft as before); and (iv) to the delayed flight attendants, who likewise may cause their next scheduled flights to be delayed.

77. Even beyond downline delays, a Chicago-based flight attendant's or pilot's sick call can have an adverse impact across an Airline's network for the additional reason that flight attendants and pilots can call out sick out-of-base. For example, if a Chicago flight attendant calls out sick at an airport where his or her Airline does not have a flight attendant base, then the Airline will need to find a flight attendant living near that airport who might be able to cover the trip, or alternatively, the Airline will have to "deadhead" a flight attendant from another base; both of which could cause hours' long departure delays. If the Airline is unable to find a flight attendant to cover that Chicago-based flight attendant's out-of-base sick call, then that flight would have to be cancelled.

78. Finally, increased flight crew sick time use will impact the operational reliability of a base, which in turn affects the viability of that base for an Airline.

79. *Second*, increased sick calls among ground crew caused by the Ordinance will have a significant impact on the Airlines' services, including and up to causing or contributing to flight delays and cancellations.

80. For example, increased absences among above-the-wing ground employees will have a direct and significant impact on Airline services provided at:

(a) Ticket counters: When there are fewer above-the-wing employees working at the ticket counter and kiosks, passengers are more likely to have longer lines waiting for assistance from an Airline employee, including for necessary tasks like printing boarding passes, checking baggage, or resolving other pre-departure issues. When passengers are delayed at the ticket counter, they may risk missing their flight altogether. Moreover, when passengers are delayed at the ticket counter, they may be unable to timely check in their bags for departure.

(b) Gates: When an Airline is short-staffed at the gates, that typically means that one gate agent will work a gate by themselves, even though this is typically a two-person job. This could potentially slow the boarding process and lead to a longer boarding time, which may ultimately affect a flight's on-time departure. Moreover, short-staffing can affect the aircraft arriving

24

at the short-staffed gates, because employees working at the gates assist with deplaning.

81. Likewise, increased absences among below-the-wing ground employees caused by the Ordinance will have a direct and significant impact on Airline services, including:

(a) Baggage loading: When the bag room is short-staffed, Airlines are sometimes forced to delay departures -- mainly on international flights -- in order to ensure that bags will make the plane, because otherwise the bags may not get to their destinations for significant periods of time. On domestic flights, the bags may not get loaded before the aircraft departs. Additionally, short-staffing in the bag room can also result in misplaced bags, which also significantly impacts the Airlines' passengers.

(b) Baggage unloading: When the bag room is short-staffed, passengers are usually forced to wait a long time for their bags to arrive at the baggage carousel.

(c) Towing: When towing or move teams, which are skilled positions, are short-staffed, it will generally take longer for aircraft to be moved from the hangar to the gates, or between gates, which can lead to delayed boarding and/or departures.

(d) Water and Lavatory services: When water and lavatory teams, which are skilled positions, are short-staffed, it will generally take longer for the aircraft to be serviced, which can cause delayed boarding and/or departures.

(e) Taxiing and Deplaning services: When a ramp team is short-staffed and unavailable to meet an arriving aircraft, this can lead to gate holds, which is when an aircraft is held on the tarmac for more than ten minutes, and, among other things, that ground hold can delay connecting passengers and in-flight crew.

82. Similarly, increased absences among maintenance employees caused by the Ordinance will have a direct and significant impact on the Airlines' services. When an Airline's maintenance team is short-staffed, it will generally take longer to complete maintenance requests at the gate on aircraft scheduled shortly for departure. This can cause delayed boarding and/or departures. Short-staffing among a maintenance team will also lengthen the time it takes to perform scheduled or otherwise required maintenance during an aircraft's layover in Chicago, which can cause maintenance tasks to be deferred or flights to be delayed or cancelled until the

required maintenance can be performed. Additionally, when a maintenance team is short-staffed and thus unable to complete scheduled maintenance items, the number of aircraft that are "out of service" may increase, which can lead to flight delays or even cancellations.

83. As noted above, the impact of increased ground crew absences caused by the Ordinance on any one of the above-described services, alone or in combination, will affect yet another critical service of the Airlines: the on-time departure of aircraft.

84. The Airlines are forced to employ mitigation strategies to attempt to find coverage for employees who call out sick. For example, the Airlines often have a subset of flight attendants who sit on "reserve" and may be available to fill in for missing flight attendants (*e.g.*, flight attendants who are sick, but also flight attendants whose earlier flights are delayed for any number of reasons) and sometimes have a subset of "bullpen" or "overage" ground employees to fill in for missing ground employees (*e.g.*, ground employees who are sick or out on vacation). Otherwise, the Airlines attempt to use premium, incentive, or overtime pay to dissuade employees from calling out sick in the first place. Each of these strategies has its limitations and, alone or in combination, cannot and do not insulate the Airlines from the service impacts attributable to employee absences. Further, each of these strategies is significantly costly for the Airlines. The Ordinance will require the Airlines to incur even further costs for these mitigation strategies and/or to implement expensive changes to their business models (*e.g.*, hiring more employees, staffing more reserve or standby flight attendants, staffing more "overage" ground employees, offering more premium, incentive, or overtime pay). This significant impact to the Airlines' mitigation strategies and business models is in and of itself an impermissible impact caused by the Ordinance, and will significantly impact the Airlines' prices, routes, and/or services.

85.     Notably, two district courts have already held that paid sick leave laws, with provisions substantially similar to the Ordinance's Paid Sick Leave provisions, are preempted by the ADA.  In *Delta Air Lines, Inc. v. New York City Department of Consumer Affairs*, 564 F. Supp. 3d 109, 124 (E.D.N.Y. 2021), the Eastern District of New York held that compliance with New York City's paid sick time law -- which has similar paid sick leave provisions as the Ordinance -- would have a potential impact on "the availability of flight attendants, and thus on-time flights, a core service of the airline," and thus was preempted by the ADA.

86.     Likewise, in *Air Transport Ass'n of America, Inc. v. Campbell*, No. 18-CV-10651-ADB, 2023 WL 3773743, *12 (D. Mass. June 2, 2023), the District of Massachusetts held that Massachusetts' paid sick leave law -- which also has similar paid sick leave provisions as the Ordinance -- was preempted by the ADA because it "caus[ed] an increase in employees calling out sick," and had "a clear and direct impact, which is not tenuous, remote or peripheral, on the availability of the Airlines' labor force and therefore their ability to provide . . . services to customers."

87.     The Ordinance's Paid Leave Hours.  The increase in late-scheduled or ill-timed employee absences which will be caused by the Ordinance's Paid Leave provisions will also significantly impact the Airlines' prices, routes, and/or services for the same reasons discussed *supra* ¶¶ 74-83.  For example, the Airlines' employees will likely attempt to use Paid Leave at times when it may be difficult for them to use their vacation time:  *i.e.*, during the busier travel periods when Airlines need sufficient staffing to handle the increased travel loads.

88.     Moreover, the Ordinance's Paid Leave provisions will impermissibly force the Airlines to employ expensive mitigation strategies for the same reasons discussed *supra* ¶ 84.

89. For all the reasons discussed herein, the Ordinance will have a significant impact on the Airlines' prices, routes and/or services, and thus is preempted by the ADA.

## THE ORDINANCE INTERFERES WITH, AND DESTABILIZES, THE COLLECTIVE BARGAINING PROCESS

90. The Ordinance intrudes upon and interferes with the collective bargaining process as envisioned by Congress, and as reflected in the RLA, for the resolution of workplace disputes and the determination of terms and conditions of employment for employees in the airline industry. As a result, the Ordinance is preempted.

91. The Ordinance frustrates the effectuation of Congress's objectives in numerous ways, including:

(a) By regulating in detail every aspect of the Airlines' sick leave, personal leave, and vacation policies and by interfering with myriad CBA provisions relating to compensation, medical benefits, timekeeping, scheduling, seniority, discipline, reliability, and absence more generally as well as by interfering with the jurisdiction of the CBAs' arbitral dispute-resolution procedures;

(b) By mandating through legislation specific terms and conditions of employment for Airline employees, which their unions have been unable to achieve through the collective bargaining process, thereby circumventing the collective bargaining process and depriving the Airlines of the opportunity to obtain any benefit in exchange for providing employees more generous terms of employment than the Airlines already provide;

(c) By delegating to unions the unfettered authority to determine whether Airlines must comply with the requirements of the Ordinance or, instead, whether compliance is waived through a CBA; and

(d) By expressing in numerous ways an affirmative preference for union representation of employees covered by the Ordinance.

92. The Ordinance cannot be saved as an otherwise-permissible "minimum labor standard" for numerous reasons, including:

(a) It does not affect union-represented and non-union employees equally;

28

(b)     It does not even require that union-represented employees have comparable paid sick leave and other paid time-off benefits under their CBAs -- only that the unions have agreed, for whatever reason, to waive the requirements of the Ordinance;

(c)     It imposes numerous terms by legislative fiat which unions could not achieve through collective bargaining;

(d)     It is not a law of general application, as it exempts significant swaths of the workforce.

### COUNT I

### THE AIRLINE DEREGULATION ACT PREEMPTS THE ORDINANCE

93.     A4A re-alleges and incorporates herein each of the preceding allegations.

94.     The Supremacy Clause, Article VI, Clause 2, of the United States Constitution states: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2.

95.     Under the Supremacy Clause, federal law preempts any state or local regulation in an area in which Congress has expressly or impliedly exercised exclusive authority.

96.     Congress enacted the ADA in 1978 to deregulate the airline industry; to ensure maximum reliance on competitive market forces; to encourage efficiency, innovation, and lower prices; and, to meet the needs of consumers and the commerce of the United States. To prevent states and municipalities from undoing federal deregulation of air transportation with regulation of their own, Congress enacted a broad express preemption provision. The ADA expressly and broadly prohibits state and local governments from enacting or enforcing "a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1).

97.     The U.S. Supreme Court has held that § 41713(b)(1) is "deliberately expansive." *Morales*, 504 U.S. at 384 (citation omitted). The ADA broadly preempts all state laws that have a

29

"significant impact" on airline prices, routes, or services -- even if the state law is "not specifically designed to affect" airlines, and even if its "effect is only indirect," as long as it is not "too tenuous, remote, or peripheral." *Id.* at 386, 390 (citations omitted).

98. The Ordinance will have a "significant impact" on the Airlines' prices, routes, and services, and is therefore preempted by the ADA.

99. *First*, the Ordinance will cause an increase in employee absences from both use and abuse of the Ordinance's Paid Sick Leave and in late-scheduled and ill-timed use of the Ordinance's Paid Leave, which will have a significant impact on the Airlines' prices, routes, and services. For example, such increased absences will significantly impact numerous Airlines' services, including: (i) on-time boardings; (ii) on-time departures; (iii) services at the ticket counter, at the gates, in premium service clubs, in baggage service offices, and other customer contact services; (iv) baggage loading and unloading, aircraft towing, de-icing, servicing of water and lavatory equipment, aircraft taxiing, and deplaning services; and (v) aircraft maintenance services.

100. *Second*, these increased absences will cause the Airlines to change their services (*e.g.*, reducing or altering the services provided to passengers, as discussed *supra*, to compensate for increased employee absences) and force them to employ potential mitigation strategies (*e.g.*, hiring additional employees, reworking reserve and overtime programs) to protect their operations. The Airlines' services and mitigation strategies are core parts of the Airlines' business models. The increased absences caused by the Ordinance will thus affect the Airlines' business models, which in and of itself is another impact of the Ordinance rendered impermissible by the ADA's preemption provision. This impact to the Airlines' services, mitigation strategies, and business models will significantly impact the Airlines' prices, routes, and/or services.

101.     Because the Ordinance impermissibly relates to the Airlines' "prices, routes, or services," the ADA preempts the Ordinance in its entirety.  As a result, the Ordinance violates the Supremacy Clause of the United States Constitution.  Accordingly, A4A is entitled to a judgment declaring that the Airlines are not subject to the Ordinance and an injunction against enforcement thereof.

**COUNT II**

**THE RAILWAY LABOR ACT PREEMPTS THE ORDINANCE**

102.     Plaintiff re-alleges and incorporates herein each of the preceding allegations.

103.     A state or local law is preempted if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Boomer v. AT&T Corp.*, 309 F.3d 404, 417 (7th Cir. 2002) (citation omitted); *see also Effex Cap., LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 893 (7th Cir. 2019) (*quoting Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). Federal labor law, whether the National Labor Relations Act, 29 U.S.C. §§ 151-169, or the Railway Labor Act (the "RLA"), 45 U.S.C. §§ 151-188, preempts state and local laws which intrude upon the collective bargaining process -- but it does not preempt minimum labor standards. *See generally 520 S. Mich. Ave. Assocs., Ltd. v. Shannon*, 549 F.3d 1119, 1128 (7th Cir. 2008). Because the Ordinance interferes with the collective bargaining process in numerous respects and does not qualify as a minimum labor standard, it is preempted by the RLA.  The Ordinance is preempted for the additional reason that application of the Ordinance will depend on the interpretation or application of terms of CBAs.

104.     ***First,*** the Ordinance frustrates the congressional objectives of the RLA and interferes with the collective bargaining process in numerous respects.  For example:

    (a)     The Ordinance imposes a pervasive scheme of regulation with respect to numerous aspects of the working relationship between Airlines and their employees, in derogation of the terms of collective bargaining agreements

31

carefully negotiated over long periods of time between the Airlines and the unions representing the Airline employees. In particular, the Ordinance does much more than simply require a specified amount of paid sick leave or other paid time off. Instead, it regulates in painstaking detail every aspect of the Airlines' sick leave, personal leave, and vacation policies and, in so doing, interferes with myriad CBA provisions relating to subjects such as compensation, medical benefits, timekeeping, scheduling, seniority, discipline, reliability, and absence more generally.

(b)     The Ordinance mandates through legislation specific terms and conditions of employment for Airline employees which their unions have been unable to achieve through the collective bargaining process.

(c)     The Ordinance delegates to unions the unfettered authority to determine whether Airlines must comply with the requirements of the Ordinance. In particular, when the unions enter into new CBAs with the Airlines after July 1, 2024, there can be no departures from the literal requirements of the Ordinance unless "the waiver [of the Ordinance's provisions] is set forth explicitly in such [collective bargaining] agreement in clear and unambiguous terms." Mun. Code of Chi. art. II, tit. 6, ch. 6-130-040(a). Some of the Airlines' unions have historically not included waivers of provisions of specific state and local regulations in their CBAs, and other unions have declared that they are unwilling to do so in the future. And, even if they may be willing to grant the explicit waiver required by the Ordinance, unions will no doubt extract a heavy price.

(d)     It will inevitably be necessary in many instances to determine whether a union has in fact agreed to waive the provisions of the Ordinance and, under the RLA, only an arbitration tribunal can decide whether a union has so agreed on behalf of the employees it represents. *See, e.g.*, *Miller v. Sw. Airlines Co.*, 926 F.3d 898, 903-06 (7th Cir. 2019); *Winkler v. Am. Airlines, Inc.*, No. 23-c-1208, 2023 WL 7269315, at *2 (N.D. Ill. Oct. 2, 2023) (holding that claim under predecessor to Ordinance was preempted by RLA; "American says that the CBA is an explicit, clear, and unambiguous waiver of any conflicting provision of local ordinances; Winkler says it isn't. If that is not a dispute that requires interpretation of the CBA, it is difficult to imagine what would be").

(e)     The Ordinance expresses in multiple ways an affirmative preference for union representation of employees, rather than remaining neutral as Congress envisioned in its enactment of the federal labor laws. *See infra* ¶ 106.

In these and other ways, the Ordinance impermissibly creates "a disincentive to collective bargaining and instead encouragement for employers or unions to focus on lobbying at [city hall]

32

instead of negotiating at the bargaining table." *520 S. Mich.*, 549 F.3d at 1132-33.

105.     ***Second***, the Ordinance does not qualify as a minimum labor standard for numerous reasons.

106.     As an initial matter, minimum labor standards "'affect union and nonunion employees equally, and neither encourage nor discourage the collective-bargaining processes that are the subject of'" federal labor law. *520 S. Mich.*, 549 F.3d at 1129 (*quoting Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 755 (1985)).  The Ordinance does not do so.  Instead, the Ordinance manifests an affirmative preference for collective representation in numerous ways. For example:

> (a)     Under the Ordinance, employers (including the Airlines) who currently have CBAs with unions can continue to apply the terms of those CBAs, including provisions pertaining to paid sick leave and other paid time off which are inconsistent with the substantive terms of the Ordinance, and need not begin to comply with the Ordinance until they enter into a new CBA after July 1, 2024. *See* Mun. Code of Chi. art. II, tit. 6, ch. 6-130-040(a).  Conversely, employers (including the Airlines) whose Chicago-based employees choose not to be represented by a union must begin complying with the Ordinance on July 1, 2024.

> (b)     The Ordinance does not apply to "any Employee working in the construction industry who is covered by a bona fide collective bargaining agreement" (*see id.*), but it does apply to non-union employers in the construction industry.

> (c)     The Ordinance also declares that "*[o]ther than a collective bargaining agreement*, any agreement to waive rights granted under this chapter is void as against public policy." *Id.* ch. 6-130-040(b) (emphasis added).

107.     Moreover, in order to qualify as a minimum labor standard, the Ordinance must set a "low threshold," *520 S. Mich.*, 549 F.3d at 1134, and not mandate "terms of employment that would be very difficult for any union to bargain for." *Id.*  The Ordinance fails this test in numerous ways, including, but not limited to, the following:

> (a)     The Ordinance prohibits points-based attendance systems, restricts the use of doctor's notes, and expands the reasons for which employees can use sick

33

time -- long-standing features of Airline CBAs (and Airline policies authorized by CBAs), which unions have been unable to get the Airlines to abandon through the collective bargaining process.

(b)     The Ordinance provides for an award of treble damages plus interest for an aggrieved employee, as well as the recovery of attorney's fees, and costs, *see* Mun. Code of Chi. art. II, tit. 6, ch. 6-130-090; *520 S. Mich.*, 549 F.3d at 1135 (referring to substantively-identical provisions in Illinois statute held to be preempted, and stating that "[t]hese statutory provisions can in no sense be considered 'minimal'" (citation omitted)).

(c)     The Ordinance creates a private right of action in derogation of the grievance and arbitration procedures which are mandated by the RLA to resolve these kinds of workplace disputes, *see* Mun. Code of Chi. art. II, tit. 6, ch. 6-130-100; *520 S. Mich.*, 549 F.3d at 1137 (noting that, by virtue of its provision for a private right of action, the Illinois statute held to be preempted "encourag[es] litigation rather than resolution through the mechanism established by the CBA").

108.    The Ordinance also does not qualify as a minimum labor standard because it is not a law of general application as it does not apply to:

(a)     Workers in the "Construction industry" who are covered by a CBA (without regard to whether the CBA contains an explicit waiver of the Ordinance's requirements) -- with "Construction industry" broadly defined to include "any constructing, altering, reconstructing, repairing, rehabilitating, refinishing, refurbishing, remodeling, remediating, renovating, custom fabricating, maintenance, landscaping, improving, wrecking, painting, decorating, demolishing, and adding to or subcontracting from any building, structure, highway, roadway, street, bridge, alley, sewer, ditch, sewage disposal plant, waterworks, parking facility, railroad, excavation or other structure, project, development, real property, or improvement, or to do any part thereof, whether or not the performance of the work described herein involves the addition to, or fabrication into, any structure, project, development, real property or improvement herein described of any material or article of merchandise. Construction shall also include snow plowing, snow removal, and refuse collection," *see* Mun. Code of Chi. art. II, tit. 6, chs. 6-130-010 (definition of "Construction industry"), 6-130-040(a);

(b)     Employees of the United States, *see id.*, ch. 6-130-010 (definition of "Covered Employee");

(c)     Employees of the State of Illinois, *see id.*;

34

(d)    Any worker defined as an "employee" under the federal Railroad Unemployment Insurance Act, essentially any employee of a railroad, *see id.* (definition of "Employee"), 45 U.S.C. § 351(a); and

(e)    Any employee covered by a CBA which contains an explicit waiver of the Ordinance's provisions (without regard to whether the CBA provides comparable paid sick leave and other paid time off benefits), *see* ch. 6-130-040(a).

109.    For all of the foregoing reasons, the Ordinance impermissibly intrudes upon and interferes with the collective bargaining process as envisioned by Congress for the resolution of workplace disputes and the determination of the terms and conditions of employment for employees in the airline industry. The Ordinance is therefore preempted by the RLA and, as a result, it violates the Supremacy Clause of the United States Constitution. A4A is, accordingly, entitled to a judgment declaring that the Airlines are not subject to the Ordinance and an injunction against enforcement thereof.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff A4A asks for the following relief:

(a)    Judgment against Defendant declaring that the Ordinance, and any rules promulgated thereunder, as applied to the Airlines:

    (i)    is preempted by the Airline Deregulation Act, and is therefore unenforceable by virtue of the Supremacy Clause of the United States Constitution; and

    (ii)    is preempted by the Railway Labor Act, and is therefore unenforceable by virtue of the Supremacy Clause of the United States Constitution.

(b)    Permanent injunctive relief prohibiting enforcement of the Ordinance against the Airlines.

(c)    An award to A4A for its attorneys' fees and costs incurred in this action under 42 U.S.C. § 1988, and any other applicable law.

(d)    Any other relief the Court may deem just and appropriate.

Dated:  June 4, 2024

Chris A. Hollinger (*pro hac vice* forthcoming)
Molly Edgar (*pro hac vice* forthcoming)
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, California 94111
Telephone: (415) 984-8700
chollinger@omm.com
medgar@omm.com

Respectfully submitted,

/s/ Amy L. Van Gelder
Amy L. Van Gelder (ARDC No. 6279958)
Amanda L. Brown (ARDC No. 6312421)
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
320 S. Canal Street,
Chicago, Illinois 60606
Telephone: (312) 407-0700
amy.vangelder@skadden.com
amanda.brown@skadden.com

James R. Carroll (*pro hac vice* forthcoming)
Alisha Q. Nanda (*pro hac vice* forthcoming)
Emily M. Jennings (*pro hac vice* forthcoming)
Anne Rabon (*pro hac vice* forthcoming)
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116
Telephone: (617) 573-4800
james.carroll@skadden.com
alisha.nanda@skadden.com
emily.jennings@skadden.com
anne.rabon@skadden.com

*Counsel for Plaintiff*
*Air Transport Association of America, Inc.*
*d/b/a Airlines for America*

36